IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| Bobby and Minnie Walsh, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> Lugoff-Elgin Water District of Kershaw County and Michael Hancock, in his individual capacity, <br><br> Defendants. | Civil Action No. 3:08-3122-CMC <br><br><br> **OPINION and ORDER** |

This matter is before the court on Defendants' pre-certification motion for summary judgment. For the reasons set forth below, the motion is granted in full and the Clerk of Court is directed to enter judgment for Defendants on all causes of action.[1]

**STANDARD**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987).

The party moving for summary judgment has the burden of showing the absence of a genuine

---

[1] Defendants have also filed a motion to strike Plaintiffs' sur reply. While the court agrees that the sur reply should not have been filed without seeking leave of court, the court has considered the sur reply in resolving Defendants' motion for summary judgment. Defendants' motion to strike the sur reply is, therefore, denied.

issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). When the nonmoving party has the ultimate burden of proof on an issue, the moving party must identify the parts of the record that demonstrate the nonmoving party lacks sufficient evidence. The nonmoving party must then go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

A party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). Therefore, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995). Likewise, a party cannot create a genuine issue of material fact by presenting his or her own conflicting versions of events. *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984) ("A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct.").

## FACTS

**Parties.** Taken in the light most favorable to Plaintiffs, the facts are as follows. Plaintiffs Bobby and Minnie Walsh (collectively "the Walshes" or "Plaintiffs") reside in a home in an area that receives water service from Defendant Lugoff-Elgin Water District of Kershaw County ("LEWA").[2] In late December 2006, the Walshes signed a contract with LEWA and began receiving

---

[2] The court utilizes the same abbreviation for this Defendant as used by the parties which refers to this Defendant's more commonly used name: Lugoff-Elgin Water Authority.

water service from LEWA shortly thereafter. Mrs. Walsh Aff. ¶ 4. Water service continued until late June 2008 when LEWA terminated the Walshes' water service because of an unresolved billing dispute relating to damage to a portion of the Walshes' water meter.

LEWA is a special purpose district created by the General Assembly of the State of South Carolina pursuant to Act 784 of 1964. That Act provides as follows:

> It shall be the purpose and function of the district to acquire, construct, and operate a waterworks system . . . at such convenient points as [LEWA] shall select, to provide a flow of water through pipes to the community of LEWA and to such other domestic, commercial or industrial users who can be conveniently and economically served . . . ."

1964 S.C. Acts § 1. The record does not disclose whether the Walshes reside within the "community of LEWA" or fall within the category of domestic users outside that community who are served because they "can be conveniently and economically served."

Defendant Michael Hancock ("Hancock") serves as the general manager of LEWA. Hancock was directly involved in the billing dispute at issue in this action through his exchange of correspondence with the Walshes' attorney. Hancock reports to LEWA's Board, which is the entity with ultimate management authority for the organization.

**Billing Dispute.** On May 19, 2008, Mrs. Walsh received a call from Phil Jeffers ("Jeffers"), an employee of LEWA. Mrs. Walsh Aff. ¶ 8. Jeffers informed Mrs. Walsh that LEWA's meter reader had discovered damage to the Walshes' water meter and that LEWA would charge the Walshes $150 for this damage. *Id.* Jeffers explained that the damage appeared to have been caused by a lawn mower. Mrs. Walsh Dep. at 20. Mrs. Walsh did not, in that conversation, deny that she or her husband caused the damage. Mrs. Walsh Dep. at 21 (stating that she did not deny causing the damage in that phone conversation). *But see* Mrs. Walsh Aff. ¶ 8 (stating to the contrary).

3

Jeffers did not inform Mrs. Walsh of LEWA's policies regarding billing dispute resolution. Mrs. Walsh Aff. ¶ 8. Neither is there any indication that Mrs. Walsh asked what procedures were available to dispute the bill. *See generally* Mrs. Walsh Dep. at 20-21. Instead, at the end of the conversation, Mrs. Walsh asked for Jeffers' phone number so her husband could call Jeffers back. *Id.*

The portion of the Walshes' meter which was damaged is a transmitter referred to as an MXU. Hancock Dep. at 74. The MXU sits atop the metal meter box and is, consequently, subject to damage from external forces such as lawn mowers. LEWA warned its customers of this risk in its May 1, 2008, bills after noting that several MXUs had been damaged.[3] Hancock Dep. at 94-95; *see also* Jeffers Dep., Ex. P (Lugoff 0200) (print out of multiple billing messages including the May 1, 2008, message stating "Do not run over meter boxes with lawn mowers. There is a $150.00 charge to repair damage.").

On May 20, 2008, Mr. Walsh called Jeffers. Mr. Walsh Aff. ¶ 12. During that call, Mr. Walsh stated that he had not damaged the water meter. *Id*.; *see also* Mr. Walsh Dep. at 59. Mr. Walsh also raised other issues including concerns as to the location and height of the meter box and suggested that the damage may have occurred when someone else mowed the area such as a neighbor or the highway department. Mr. Walsh Dep. at 59-61. Mr. Walsh recalled the conversation as follows:

> [I]t was professional neither got loud. And I did tell him I said I do not feel like it

---

[3] It is not clear whether the damage to the Walshes' meter was observed by the meter reader before or after the May 1, 2008, bill. At least some meters had been damaged prior to the issuance of the May bills which included this notice. Hancock Dep. at 94-96 (indicating a total of three customers, including the Walshes, had meters which were damaged by lawn mowers during this time frame).

4

> is right that I pay that and I did not do the damage. That is what I told him. And then I said I can see right now that me and you are not getting anywhere. I would like to discuss this with your supervisor. . . . And he said I understand and I will call you tomorrow.

*Id.* at 59.

In his post-deposition affidavit, Mr. Walsh states that Jeffers indicated his supervisor, rather than Jeffers, would return the call the next day. Mr. Walsh Aff. ¶ 12. Mr. Walsh also avers that Jeffers did not inform him of any policies or procedures regarding billing dispute resolution. *Id.* As with Mrs. Walsh's testimony, there is no indication Mr. Walsh expressly inquired as to the available dispute resolution procedures.

The Walshes' next communication from LEWA was apparently a bill that included the $150 charge for the damaged meter.[4] Mrs. Walsh Aff. ¶ 10. This bill, received on May 31, 2008, was the first written notification of the $150 charge for the damaged MXU. It did not include any instructions for disputing the charges. *Id.* Mrs. Walsh mailed a payment on June 2, 2008, paying the portion of the bill which represented water usage but not the $150 charge for the water meter. *Id.*[5]

On June 3, 2008, Jeffers' supervisor, Cathi Gladden ("Gladden") called the Walsh home

---

[4] Neither of the Walshes expressly state in their affidavits or in the deposition excerpts provided to the court that they did *not* receive any return call from Jeffers or his supervisor after Mr. Walsh's May 20, 2008, conversation with Jeffers. Mrs. Walsh's deposition testimony regarding the chronology of events, however, is that the next significant event was the receipt of a bill on May 31, 2008. The court, therefore, assumes for present purposes that no LEWA representative followed up with the Walshes after the May 20, 2008, conversation between Jeffers and Mr. Walsh.

[5] There is no indication that Mrs. Walsh included any statement with her payment challenging the $150 charge or otherwise indicating an intent to dispute the charge. Instead, it appears that she simply paid the portion she agreed was due and made no comment as to the remainder. The result of this motion would, however, be the same even if such a note was included.

5

regarding the non-payment of the $150 charge. *Id. ¶* 11. Gladden reached Mrs. Walsh and advised her that the Walshes' water would be "cut off" if they did not pay for the damage. *Id.* Mrs. Walsh again denied that she or her husband caused the damage. *Id.* Gladden did not advise Mrs. Walsh of any dispute resolution procedures but did offer to set up a payment plan. *Id.*

> Mrs. Walsh described the conversation as follows during her deposition:
>
> Kathy called me and she said Ms. Walsh this is Kathy of Lugoff-Elgin Water Authority and you did not pay your bill. I am going to have to put you in a cut off status. I do not want to cut your water off. And she said the meter reader said that the meter was damaged [and it] appeared to be by . . . the customer's lawnmower. And she said we just put in new meters and we cannot incur the costs to replace broken meters. She said I can set up a payment plan for you. . . . And I said well that is just it. We did not do it. . . . I said I do not know who did it [or] how it got done or when it got done but we did not do it. And then she said well it was not broken in April and so then I said well now Bobby talked to Phil [Jeffers] and Phil said his supervisor was going to return the call and he never did. And she says I am Phil's supervisor. *I said okay well give me your name and number and I will have Bobby call you. And she gave me her name and her number and I called Bobby and then Bobby said well I am going to call the attorney.* So he called the attorney and from that point on it is my understanding that they had received a letter saying that they were not supposed to contact us.

Mrs. Walsh Dep. at 25-26 (emphasis added).

Following this deposition testimony, Mrs. Walsh was asked if Gladden ever told her that there "was no way . . . to dispute the charges." *Id.* at 26. Mrs. Walsh responded, "She did not say there was no way but she did not offer any alternati[ve] except that I will set up a payment plan." *Id.*

As Mrs. Walsh explained in her deposition, Mr. Walsh elected not to follow up with Gladden. Instead, he contacted an attorney to pursue the matter further. Mr. Walsh Aff. ¶ 15. The Walshes' attorney faxed a letter to LEWA's general manager, Michael Hancock, on June 5, 2008. *Id*. at Ex C. In the letter, the Walshes' attorney denied that the Walshes had damaged the meter and

6

requested two specific actions: (1) that LEWA withdraw the $150 charge for the water meter from the Walshes' account; and (2) that LEWA"[p]rovide a system for some sort of hearing and appeal when such charges are made." *Id.* The latter request was intended not only for the benefit of the Walshes but also for "other citizens located in your district." *Id.*

Hancock responded by facsimile the same day stating as follows:

> Thank you for your letter on behalf of Mr. Bobby Walsh. I have enclosed the Authority's policies with respect to disputed bills and damage to Authority property. The appeal process outlined in the disputed bills policy is available to Mr. Walsh.
>
> The Authority will not discontinue Mr. Walsh's service until he has completed the appeal process provided he initiates his appeal within fifteen (15) days of the date of the letter.

Mr. Walsh Aff., Ex. D.

Hancock attached an excerpt from the LEWA policy manual that outlines a rather informal four-step dispute resolution process: (1) if the customer "is not satisfied with the correctness of a bill," the customer should "contact Customer Service" which will "assist the [customer] and gather data;" (2) "[i]f after gathering all pertinent data, the [customer] is not satisfied, the [customer] may be referred to the Administrative Superintendent;" (3) "[i]f that fails to satisfy the [customer] the matter may be brought before the General Manager whose decision will be FINAL;" and (4) "[a] customer dissatisfied with the decision of the General Manager may ask that the decision be reviewed at the discretion of the Board. The Board is under no obligation to consider the matter." Mr. Walsh Aff., Ex. D.[6]

Due to an oversight by counsel, neither the Walshes nor their attorney took any further action

---

[6] A later note on the same page indicates that "Appeal to the General Manager is available only after the Customer Service Department has been unsuccessful in resolving the matter."

7

until twenty-one days later.  *See* Mr. Walsh Aff., Ex. E (June 26, 2008, letter sent via facsimile).[7]
On that date, the Walshes' attorney wrote Hancock noting that the Walshes' water had just been cut off and conceding that he had missed the "fifteen day window to appeal [LEWA's] decision."  *Id.*
Counsel asked that the time for appeal be extended, explained his personal circumstances which had led to the oversight, and concluded, "If you cannot hear an appeal, I will seek relief in summary court, as this charge (for the water meter) is without merit."  *Id.*[8]

Hancock responded to counsel's request for an extension on the same day, also via facsimile. His letter read, in full, as follows: "The Lugoff-Elgin Water Authority was kind enough to give Mr. Walsh 15 additional days to appeal our decision.  He did not avail himself of the opportunity.  His water service will remain shut off until his account is paid."  Mr. Walsh Aff., Ex. F.  Despite the finality suggested by this letter, Hancock testified in his deposition that the Walshes still could have appealed to LEWA's Board and that there was no time limit for such an appeal.  Hancock Dep. at 126-27.  Hancock's testimony is consistent with the policy provided to the Walshes' attorney, which

---

[7] During his deposition, Mr. Walsh repeatedly stated that he had never seen the letter from Hancock until it was presented to him at his deposition.  Mr. Walsh Dep. at 68-69.  *See also* Mrs. Walsh Dep. at 28 (indicating that she first saw the letter when it was produced through discovery). Mr. Walsh also denied having seen the excerpt from the policy manual included with the letter. Counsel's failure to advise the Walshes of the letter is particularly surprising given that Mr. Walsh was, during the relevant period, "work[ing] on some electrical projects in [counsel's] house while [counsel and his family] were moving in to their new house."  Mr. Walsh Aff. ¶ 17.  Nonetheless, Mr. Walsh indicated that he "most likely would have" initiated that dispute process had he been made aware of it.  Mr. Walsh Dep. at 71; s*ee also id.* at 74 (indicating he "was going to participate" if given the opportunity to raise a belated appeal after his water was cut off).

[8] The circumstances summarized in the letter are that counsel "was getting married last week and moving four step-children into my home during the past two weeks."  Mr. Walsh Aff., Ex. D.; *see also* Mr. Walsh Aff. ¶ 17 (stating that Mr. Walsh had personal knowledge of the circumstances which included that his attorney was "getting married during this time and moving his four step-children from Manning and his two children into a new house in Camden").

8

indicates that step four allows customers to ask the Board to review the General Manager's final decision.

The Walshes' would have participated in the appeal offered by Hancock had they been made aware of the opportunity to appeal offered in his letter. *See supra* note 7. Unfortunately, what that appeal might have entailed and whether it would have led to a positive result is unknown because the rights were not pursued by the Walshes or their counsel during the time allowed by Hancock.[9] *See* Walsh Dep. at 75 (conceding he cannot know if the procedure would have been a sham because he did not participate in it).

## COMPLAINT AND PROCEEDINGS

A little over a month after receiving Hancock's letter of June 26, 2008, Plaintiffs filed this action in state court pursuing several claims on behalf of themselves and "all others similarly situated." These claims include claims for (1) breach of contract, (2) violation of Plaintiffs' federal due process rights (pursued under 42 U.S.C. § 1983), (3) violation of Plaintiffs' state due process rights (based on Art I, § 3 of the South Carolina Constitution), (4) a claim for negligent supervision, and (5) a claim for negligent training. All claims rest on allegations that Plaintiffs and other LEWA customers charged for broken water meters were denied notice of the available procedures for dispute resolution or access to those procedures, or both. *See, e.g.*, Complaint ¶¶ 25-27 (Plaintiffs' claim for breach of contract is based on allegations that Plaintiffs were only informed of the "procedural safeguards concerning bill complaints" after hiring counsel; that Plaintiffs and other putative class members "have been, in essence, held over a barrel and forced to pay unreasonable

---

[9] Whatever the review might have involved, it would apparently not have included an opportunity to examine the damaged meter as that was, according to Hancock, "discarded . . . [s]hortly after it was found torn up." Hancock Dep. at 75.

9

fees without due process or other recourse;" and that they have been "treated shabbily, wrongfully and with deliberate indifference" in connection with the disputed charges). Plaintiffs' primary concern appears to be that they were not provided an explanation of the available procedures until they contacted an attorney.[10]

Defendants removed the action to this court on September 10, 2008. The matter has proceeded through the first phase of discovery relating both to the propriety of class certification and the claims of the named Plaintiffs. Through the present motion, Defendants challenge the viability of all of Plaintiffs' causes of action.

## ARGUMENTS

Defendants pursue summary judgment on all causes of action based on Plaintiffs' alleged failure to "exhaust administrative remedies" prior to filing this action. In addition, Defendants argue that the second and third causes of action (state and federal due process claims) fail because (1) Plaintiffs have no "protected property interest in water service from a rural community water district in South Carolina" and (2) Plaintiffs were "provided ample procedural due process, including notice and an opportunity to be heard." The second of these arguments also applies to the three state law claims (Breach of Contract, Negligent Supervision, and Negligent Training) because they are also founded on an alleged failure to provide reasonable dispute resolution procedures. As to the Section 1983 claim, Defendant Hancock argues that he is entitled to qualified immunity.

In response to Defendants' threshold argument regarding the due process claims, Plaintiffs

---

[10] In his affidavit, Mr. Walsh stated that, after missing the deadline and being refused any further appeal by Hancock, his counsel "explained that although it would have been nice to participate in the bill dispute process, LEWA's fundamental problem is that they do not offer a bill dispute resolution process until someone has hired an attorney." Mr. Walsh Aff. ¶ 20.

disavow any reliance on a property interest in water service. They argue, instead, that the property interest at stake is their monetary interest in the $150 charge which Defendant LEWA has assessed against them (or any resulting impact on their credit if an unpaid debt is reported by LEWA).[11] *See* Dkt. No. 24 at 20 ("The plaintiffs' property interest is not so grandiose as access to water service; the property interest is the $150.00 in the Plaintiffs' billfold. . . . Even if Plaintiffs have not paid the charges, the property interest is in the negative balance placed there by LEWA and the bad credit report on Plaintiffs (or bad credit reference) that follows the unpaid balance."); *id.* at 21 ("that LEWA has cut off the Walsh[es'] water is simply a bad act, not an issue of contention").[12]

Plaintiffs next argue that their Section 1983 claim is not subject to an exhaustion requirement. As to this and other claims, they argue that exhaustion of administrative remedies is unnecessary in this case because the process was "futile due to LEWA's *ultra vires* conduct, facially unconstitutional procedures, and arbitrary and capricious bill dispute resolution process." *Id.* at 23. This argument is based, in part, on an assertion that "only when a lawyer calls will LEWA attempt to follow its own rules."

As to the claim that the procedures are facially unconstitutional, Plaintiffs rely on procedures required by S.C. Code Ann. § 6-11-285, which governs the assessment of "[c]ivil penalties for violations of permit conditions or regulations of public entities which operate . . . water distribution systems[.]" Plaintiffs argue, in the alternative, that if the $150 charge is not a penalty, it should be

---

[11] The parties have not provided any evidence as to whether such a report has been made.

[12] Despite this concession, Plaintiffs include lengthy argument relating to common law duties to provide water or other utility services and seek to distinguish the case on which Defendants rely for the argument that Plaintiffs have no property interest in the underlying water service. *Id.* at 12-21. Given Plaintiffs' disavowal of an interest in water service, these arguments would now appear to be irrelevant.

11

treated as a charge or rate as to which they have a property interest because the charge was not properly approved and kept on file by the board of commissioners. Dkt. No. 24 at 17 (citing S.C. Code Ann. §§ 6-11-140 and 6-11-160).

Finally, Plaintiffs argue that Hancock's qualified immunity defense should be denied because Plaintiffs' rights were clearly established at the time of the incident. As to this argument, Plaintiffs assert that Hancock was "responsible for implementing a meaningful and adequate bill dispute resolution policy," Dkt. No. 24 at 33, and that his failure to do so violated constitutional requirements clearly established in *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1 (1978)**.** *Id.* at 31-32.

## DISCUSSION

### I.     Due Process

In order to state a valid procedural due process claim, Plaintiffs must demonstrate: (1) that they had a property interest; (2) of which they were deprived; (3) without due process of law. *Tri County Paving, Inc. v. Ashe County*, 281 F.3d 430, 436 (4th Cir. 2002). Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Id*. (quoting *Bd. of Regents v. Roth,* 408 U.S. 564, 577 (1972)). "It is federal constitutional law, however, which determines whether that property interest rises to the level of a constitutionally protected interest." *Whiting v. University of Southern Mississippi*, 451 F.3d 339, 345 (5th Cir. 2006) (further citations omitted)).

A person claiming a property interest in a governmental benefit "must . . . have a legitimate claim of entitlement." *Gardner v. City of Baltimore*, 969 F.2d 63, 68 (4th Cir.1992) (quoting *Roth,* 408 U.S. at 577). A mere "abstract need or desire for it" or "a unilateral expectation of it" is

insufficient. *Roth*, 408 U.S. at 577. The court only examines what process is required and what process was actually provided if a protected property interest is indeed established.

If a protected property interest is found, the court considers what process was due. The process due depends on the facts of a particular case. *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). To determine whether the process provided satisfies due process, courts apply the balancing test promulgated in *Mathews v. Eldridge*: courts balance (1) the private interest that is affected by the official action; (2) the risk of erroneous deprivation resulting from the procedures used; and (3) the government's interest in efficient procedures. 424 U.S. 319, 335 (1976).

### A. Protected Property Interest

Plaintiffs have disavowed reliance on a property interest in the underlying water service. *See* Dkt. No. 24 at 20. The court, therefore, considers only the property interest on which Plaintiffs expressly rely: an interest in not being assessed improper charges by a utility company (either because of their monetary interest in the $150 charge assessed against them or the risk of a reported unpaid debt if they fail to pay the charge). The parties have, however, failed to provide the court with adequate authority to enable it to determine whether this interest rises to the level of a constitutionally-protected property interest, particularly where the "injured" party has not paid the charge.[13] The court need not, however, resolve this issue because it is clear that Plaintiffs' due process claim fails even assuming the existence of a constitutionally-protected property interest.

### B. Process Provided to Plaintiffs

The court assumes for purposes of the remainder of this order that Plaintiffs were entitled

---

[13] Plaintiffs suggest that the unpaid charge may result in a report which would reflect negatively on their credit history. They have not, however, presented any evidence that such a report has been made.

13

to a "due process" opportunity to challenge charges assessed against them for damage to LEWA property located on or near Plaintiffs' property. The court further assumes that Plaintiffs' due process rights arose from LEWA's status as a quasi-governmental entity (for purposes of Plaintiffs' constitutional claims).[14]

Even with these assumptions, Plaintiffs' due process claims fail because Plaintiffs were offered, but failed to avail themselves of, a reasonable opportunity to challenge the charge at issue before they suffered any deprivation of any claimed property right. This is true whether that deprivation is described as a loss of a monetary interest in the $150 charge assessed, an adverse debt report, or even the loss of water service (although Plaintiffs have waived reliance on the last of these potential property interests). For purposes of this order, the court considers Plaintiffs' due process claims in three stages: (1) Plaintiffs' initial attempts to resolve the dispute before involving counsel; (2) the due process rights sought (and lost) through counsel; and (3) any rights which may have remained available after Hancock's June 26, 2008, letter.

**Stage 1– Initial attempts to resolve dispute without counsel.** Plaintiffs' own testimony reveals that they were being afforded the dispute resolution steps set forth in the policy manual at the time *they* elected to end their own efforts at resolution and, instead, involve counsel. That is, they first spoke to a lower level customer service representative, Jeffers, who called Plaintiffs to alert them to the charge before it appeared on the bill. Plaintiffs were then contacted by Gladden, the Administrative Superintendent, albeit not before the bill was sent out. That call ended with Mrs. Walsh's statement that she would have her husband call Gladden back. It was Mr. Walsh's choice

---

[14] At least for purposes of the present motion, the parties presume that Defendants' actions are those of state actors.

not to call Gladden back and, instead, to contact counsel which ended this stage of the process.

There may have been an error on LEWA's part when (and if) Gladden failed to call back before the bill was sent out. It also would have been better had Jeffers and Gladden provided Plaintiffs with a copy or explanation of the dispute resolution procedures when they first realized Plaintiffs disputed the charge. Neither error, however, caused any constitutional injury to Plaintiffs because they did not pay the bill or lose their right to challenge it as a result of these errors. Thus, as a factual matter, neither the actions of Jeffers nor the actions of Gladden caused the Walshes any deprivation of property or forced them to obtain counsel to gain access to the dispute resolution procedures.

**Stage 2 – Appeal through counsel.** Plaintiffs' attorney wrote to Hancock on June 5, 2008, delivering the letter by facsimile. Hancock responded in kind on that same date advising Plaintiffs' attorney of the available procedures to dispute the charge, and attaching a copy of LEWA's policy regarding resolution of billing disputes. Hancock's letter promised not to shut off Plaintiffs' water service until the dispute was resolved, presuming an appeal was initiated within fifteen days. Twenty-one days later, having heard nothing further from Plaintiffs' counsel, LEWA shut off the Walshes' water.

It is undisputed that Plaintiffs failed to take advantage of the dispute resolution procedures offered in Hancock's letter within the time frame he allowed.[15] Plaintiffs' reasons for declining to exercise their rights as outlined in Hancock's letter and the attached policy were not based on any

---

[15] The dispute resolution policy does not include a specific time frame for initiating an appeal. A relatively short period is, however, suggested by LEWA's policy regarding the date for shut off of service for unpaid bills. The time allowed by Hancock for Plaintiffs to *initiate* an appeal is consistent with the service shut-off policy and, in any event, is not unreasonable given the relatively simple issues involved.

concern that the process would be inadequate. Rather, as explained in their attorney's subsequent letter, their failure to pursue the available remedy was the result of their attorney's oversight. Thus, the injury that immediately followed (shut off of water service) cannot be attributed to LEWA.

There is, in any event, no evidence that the dispute resolution process would not have been adequate if pursued. This is, quite simply, because the process was not pursued. Given this failure to exhaust, Plaintiffs have effectively waived their right to complain that the *process which would have been provided* would have been arbitrary and capricious or a sham or would otherwise fail due process scrutiny. It is, in part, for this reason that an "exhaustion" requirement is imposed *even in Section 1983 cases* where the claim relates to an alleged due process violation. *See Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000) (explaining that, in Section 1983 cases, "a state cannot be held to have violated due process requirements when it has made procedural protection available and the plaintiff has simply refused to avail himself of them. . . . If there is a process on the books that appears to provide due process, the plaintiff cannot skip that process and use the federal courts as a means to get back what he wants.").

**Stage 3 – Post-deprivation review.** What remains is the possibility that Plaintiffs were deprived of otherwise available post-deprivation review procedures as a result of Hancock's June 26, 2008, letter.[16] That letter stated: "The Lugoff-Elgin Water Authority was kind enough to give Mr. Walsh 15 additional days to appeal our decision. He did not avail himself of the opportunity. His water service will remain shut off until his account is paid." Mr. Walsh Aff., Ex. F. Plaintiffs argue that this statement is contrary to Hancock's deposition testimony that Plaintiffs could have

---

[16] The deprivation at issue here is the shut off of service and the "finality" of the bill based on Hancock's decision not to extend the time for appeal at his level.

sought review of his decision by LEWA's Board within the 15-day period provided by Hancock or at any time thereafter.[17] Thus, Plaintiffs suggest that the letter misled them into believing that they could not petition LEWA's Board for further review.

The court finds this argument unpersuasive because Plaintiffs were represented by counsel (to whom the letter was directed) who could not reasonably have relied on Hancock's letter as precluding a petition to the Board. This is particularly true given counsel's earlier receipt of a copy of the policy which referred to the availability of discretionary review by the Board after a "FINAL" decision by the General Manager.

Plaintiffs have, in any event, failed to show that they were entitled to additional post-deprivation process. In considering what process is due, courts balance the *Mathews*' factors in light of the facts of the case. The due process clause does not require a particular type of hearing at a particular time. Rather, it requires a hearing "at a meaningful time." *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965). "Under *Loudermill*, the adequacy of pre-termination procedures must be examined in light of available post-termination procedures." *Langley v. Adams County, Colo.*, 987 F.2d 1473, 1480 (10th Cir. 1993). "If no post-termination hearing is provided, a more formal pretermination hearing is required." *Tonkovich v. Kansas Bd. of Regents*, 1996 U.S. Dist. LEXIS 18323 (D.C. Kan. 1996) (citing *Loudermill*, 470 U.S. 532 (1985)).[18] It follows that where a person

---

[17] It is not entirely clear whether Hancock's deposition testimony regarding Board review referred to review of the substantive decision to assess the charge or the review of his decision not to reopen the dispute resolution procedure at the third step after Plaintiffs' default. Presumably, the Board would consider only the latter determination as Plaintiffs' default at the third step resulted in an absence of any record to review.

[18] Many of the cases that have created the framework for analyzing due process, and particularly what type of hearing is required before the deprivation of a property interest, involved no or limited pre-deprivation opportunity to respond. *See, e.g.*, *Mathews v. Eldridge*, 424 U.S. 319

17

was offered pre-deprivations procedures which would have been adequate without further post-deprivation review, that person cannot *create* a greater right to post-deprivation review by defaulting on the otherwise adequate pre-deprivation procedures.

The court finds that the pre-deprivation process was constitutionally sufficient. Plaintiffs had multiple opportunities to dispute the charge at a meaningful time by presenting their version of the facts to LEWA personnel prior to the termination of their water service. To the extent Plaintiffs did not receive the full benefit of that process, it was the result of their own decisions and defaults. Considering the value of the property interest at stake ($150), the dispute resolution procedures available which reduce the risk of erroneous deprivation of water service, and LEWA's interest in its timely billing and collection process, the court concludes the pre-deprivation procedures complied with due process. *See Mathews*, 424 U.S. at 335.[19] Because the pre-deprivation process is sufficient, no further post-deprivation process was required. Nonetheless, Plaintiffs had, and perhaps still have, an opportunity to ask LEWA's Board to review the charge (or the denial of an extension of time to appeal) post-deprivation. The court, therefore, concludes that the available post-deprivation process was constitutionally sufficient to the extent any further process was required.

The court need not reach the affirmative defense of qualified immunity offered by Defendant Hancock, because the court finds that there is no constitutional right, and certainly no clearly-

---

(1976); *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985). However, Plaintiffs are contesting the unavailability of a *post-deprivation* opportunity to respond to the disputed charge.

[19] Plaintiffs also argue that the process offered was facially invalid. This alternative argument rests, in part, on a statute which applies only to the assessment of civil penalties. S.C. Code Ann. § 6-11-285(C). The charges at issue here are for property damage and are not, therefore, a "civil penalty" subject to the requirements of this statute.

established constitutional right, to any greater process, whether pre or post-deprivation, than was provided by Hancock. Accordingly, Defendants' motion for summary judgment is granted as to Plaintiffs' state and federal constitutional due process claims.

## II.  Contract Claim

The court presumes for present purposes that Plaintiffs have an express contractual right to the dispute resolution procedures set forth in LEWA's policy manual and that this right is subject to the duty of good faith and fair dealing implicit in every contract. For present purposes, therefore, the court presumes that LEWA owed Plaintiffs a contractual duty to afford Plaintiffs full and fair application of the dispute resolution procedure set out in the policy manual before the disputed charge became final.

However, for reasons discussed above in regard to the due process claim, Plaintiffs have failed to proffer evidence that Defendants failed to offer the contractual dispute resolution process in good faith. Defendants' motion for summary judgment on Plaintiffs' contract claim is, therefore, granted for the same reasons discussed above as to the merits of the due process claim.

## III.  Negligent Supervision and Training

Plaintiffs have failed to proffer evidence sufficient to establish their claims for negligent supervision and training. Plaintiffs have not identified how LEWA or its agents were negligent in the supervision and training of its employees in relation to its dispute resolution process, or how any such negligence resulted in harm to Plaintiffs. In fact, the record indicates that LEWA and its agents followed its policies throughout Plaintiffs' billing dispute.[20] The court, therefore, grants the motion

---

[20] As noted above, it might have been better had Jeffers or Gladden provided an explanation or copy of the procedure to Plaintiffs when they first questioned the charge. However, even if this failure was deemed an error in judgment, it could not support a claim for breach of contract because

19

for summary judgment as to these claims.

## CONCLUSION

For the reasons set forth above, the court grants Defendants' motion for summary judgment as to all claims.

**IT IS SO ORDERED.**

s/ Cameron McGowan Currie<br>
CAMERON MCGOWAN CURRIE<br>
UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
April 20, 2009

---

Plaintiffs did not suffer any resulting injury.

20